2011 Ark. App. 407

**Elizabeth Katherine TRIBBLE,
Appellant**

v.

**William C. TRIBBLE, Appellee.**

**No. CA 11–32.**

Court of Appeals of Arkansas.

June 1, 2011.

Michelle Harkey, Batesville, for appellant.

Richard Jarboe, Walnut Ridge, for appellee.

JOHN B. ROBBINS, Judge.

Appellant Elizabeth Tribble brings this appeal from an order of the Lawrence County Circuit Court in which the court awarded custody of her son, C.T., to appellee William Tribble, C.T.'s father. Elizabeth Tribble and William Tribble were married on June 3, 2006. C.T. was born on September 26, 2008. On March 23, 2010, appellee filed for divorce alleging general indignities. In his divorce petition, appellee asked the court for custody of C.T., subject to appellant's visitation rights. Appellant filed a counterclaim, also citing general indignities, and petitioned the court for custody of C.T., also subject to appellee's visitation rights. After a hearing on the matters, the court issued an order awarding appellee an absolute divorce on the grounds of general indignities and awarding appellee custody of the parties' minor child, subject to the court's standard visitation schedule. The court also issued a letter opinion outlining its reasoning for awarding appellee custody. The sole point on appeal is the child-custody issue. We affirm.

At the hearing on the divorce petition, property-division, and child-custody issues, William Tribble testified that the couple has a child, who is almost two years old. He stated that the couple separated when he moved out of the home and took C.T. with him. He stated that one of the problems in the marriage was that appellant "was always gone" and he "never knew for sure where she was." He said that when he left their home, he moved in with his parents because the couple had incurred debt and that he did not have the funds for rent. He said that he has lived with his parents since he separated from his wife and that his mother helps care for C.T. He testified that while he was married to appellant, his mother would frequently babysit C.T.

He testified that during the marriage, the couple moved from Marion to Batesville after he got a job at the prison, which paid well and allowed him to have more time off. After the couple moved to Batesville, appellant enrolled in college. At that time, appellee worked the night shift. He stated that on the nights that he worked, C.T. would stay with his parents, but on the days that he did not have to work, he would keep him. During this time, appellant also began volunteering at the Jericho Fire Department, which was about a two-hour drive from Batesville. Appellee testified that he suggested that appellant volunteer at a fire department that was closer to home, but that she refused. He said, instead, she chose the Jericho Fire Department because the fire chief, Tommy Hampton, was an ex-boyfriend of hers. Appellee testified that appellant also went to work for Hampton's business, which was a process-service business.

He testified that when he was off work, their son was with him because appellant was "never there." He said that she would work on school projects or go out of town to take photographs. He said that he was the primary person taking care of C.T. by feeding him, changing his diapers, and bathing him. He stated that when he was not caring for C.T., his parents were. He testified that his mother would spend time with C.T. by going over flashcards, reading, drawing, and playing outside.

William Tribble stated that on occasion, appellant would leave on Friday nights and would be gone throughout the weekend, coming home on Sundays. He said that on some occasions, he would return home from working the night shift, he would sleep and when he woke up, appellant would be gone and their son would be with his parents.

He said that appellant would leave two or three days at a time to "take pictures" and when he would check in with her, she would tell him that she took photos on Friday but worked at the fire station on Saturday and Sunday. Appellee stated that on one occasion, appellant went to Memphis to take photographs and called the next day to check in. Appellant told appellee that she had fallen and was bruised. However, a month before the couple separated, appellant changed her story and stated that she had been taking photos of prostitutes and had been run over.

Appellee testified that as the marriage progressed, appellant would spend less and less time with their son and that she put her own interest above the needs of their son. On one occasion, appellee testified that shortly after their son was born, appellant stated that she was going to a hockey game with Hampton and Hampton's wife and had left their son with appellee's parents. Appellee testified that when he came home from work the next morning, appellant told appellee how drunk she had become the night before, had thrown up in bed, and had "made out" with Hampton.

Appellee stated that phone records from September 2009 through May 2010 indicated that appellant had placed more than 700 calls to Tommy Hampton. Appellee also stated that appellant spent a lot of time texting and communicating with Hampton on the internet.

Appellee also testified that after the couple had separated, he noticed four separate occurrences of injuries on his son during a three-month period, each time following his son's visitation with appellant, including bumping his head, dropping something on his toe, scratching his arm, and having what appeared to be burn marks on his back. He also testified that he did not have any idea who their son was staying with when he was visiting appellant. He

testified that appellant had not informed him that their son was in daycare.

Testimony was also presented that showed appellant had signed up for an online dating website stating that she spends her free time as a volunteer firefighter and that "she wants someone adventurous in and out of the bedroom."

Paula Tribble, appellee's mother, testified that she had kept the couple's son a lot since he was born. She testified that she had kept a journal and it reflected that in the first year and one half of C.T.'s life, she had kept him 185 days. She testified that her son is a "wonderful daddy," and that he does everything that he should, including feeding him and giving him baths. She also stated that even though she is the primary cook in the house, appellee has prepared several meals for C.T. and that appellee does not need help taking care of C.T. except on the days that he works.

Appellant testified that she no longer has Tommy Hampton's phone number. She admitted that she had gone to Dallas with him but stated that she paid for her own hotel room. She said that she did have a sexual relationship with him previously, when she was 14 and he was 16. She also admitted that her cell phone bill reflected hundreds of calls from Hampton and that on one occasion, she spoke to him for 108 minutes. She said she did so because they were friends and she was the secretary for his business.

Appellant testified that she currently works five days a week at First Tennessee Bank in Memphis. She has also started her own photography business, taking wedding, family, and senior portraits. She said that she lives in a townhome with two bedrooms and that one is for C.T. She testified that her home is five miles from her father's home. While she has C.T., she cooks healthy meals and does not allow him to eat junk food or drink sodas. She stated that she is currently not in a relationship but is subscribing to personal ads on the internet.

She stated that although appellee is a good person, at the present time, he needs assistance taking care of C.T., but could care for him alone in the future. She stated that she acted as the primary caregiver of C.T. by purchasing his clothing and formula, preparing his bottles, changing his diapers, breastfeeding him, and taking him to the doctor. While they were married, she took care of paying the bills, cooking the meals, cleaning the home, and doing the laundry. Appellant acknowledged that during the marriage, when she was not at home, appellee cared for C.T. by himself. Appellant testified that she is now attending church and is taking C.T. with her. She stated that she had never injured C.T. She also stated that her family has helped her care for C.T.

She acknowledged that when appellee is at work, appellee's mother cares for C.T. Appellant stated that when she has custody of C.T., C.T. attends a learning center that is good for him. She said the center provides activities, such as playtime, nap time, and snack time. She stated that C.T. loves attending school. She also stated that if she were not employed, she would not have C.T. in daycare.

Appellant admitted to lying to appellee in the past. She stated that she became a member of the Jericho Fire Department when Tommy Hampton became chief because he offered her training and equipment for free. She did not dispute the number of phone calls she had made to Hampton, but stated that she did so because she worked for Hampton for two businesses. She testified that when she went to Dallas with Hampton, her cousin kept C.T. When her cousin needed some-

one to pick up C.T., appellant called appellee and appellee, along with his parents, picked up C.T. and kept him for a few days while she was gone.

Wanda Morgan, appellant's grandmother, testified during the hearing that her granddaughter is a wonderful, caring mother. She stated that she has on occasion been present when appellee would pick up C.T. for visitation and that C.T. would cry because he did not want to go with appellee. She stated that she had never seen C.T. cry when appellant was picking him up after he had been with appellee for visitation. She stated that appellant had [7]been the primary caregiver for C.T. and had properly cared for his basic needs. She said she thought that the learning center had been good for C.T. and that she had observed a difference in how he interacts with other children and that he had learned to speak better.

Following the hearing, the court issued an order and a letter opinion that it was in C.T.'s best interest to award custody to appellee, subject to appellant's visitation rights, which it outlined in its order. The judge stated that it was significant that appellant had apparently rekindled a relationship with a former boyfriend, Tommy Hampton, who was also the Jericho Fire Chief and the owner of a process-service business for which appellant worked. During that time, the court noted that appellant took overnight trips with Hampton, while arranging childcare of C.T. with third parties. He acknowledged appellee's testimony that even though appellant took good care of C.T. when she was home, she was "never there." The court wrote, "Her college work, the time spent traveling to and from her jobs at the Jericho Fire Department and the process service firm, and her out of town trip with her paramour caused care of the child to be turned over to others." The court found that for at least a year of C.T.'s life, C.T.'s care and nurturing were significantly neglected by appellant. He found that her pursuit of an extramarital relationship led to her being absent from her child that resulted in her leaving C.T.'s care to others on an excessive and unnecessary basis. During that same time period, the court found that appellee had spent his nonworking hours primarily caring for C.T. The court noted that appellee's work schedule allows appellee to spend a lot of time with his son, and that when he is working, he has a strong family support system that will care for C.T.

[8]Appellant brings this appeal, contending that the court's order granting custody of C.T. to appellee is based upon a desire to punish her for working multiple jobs, going to college, and having caused the marriage to dissolve. She argues that Tommy Hampton is not a factor because no proof of any affair ever existed, and if the affair had existed, it was over. She states that the only evidence of an extramarital relationship is her admission that she kissed Hampton one time and that does not constitute an extramarital affair. She states that she has a fulltime job, lives in a two-bedroom, two-bath townhouse and also has a photography business. She contends that since her education is complete and she has a fulltime job, she will have more time to spend with C.T.

She argues that appellee cannot care for C.T. on his own. She argues that during the marriage and before she enrolled in college, she was C.T.'s primary caregiver. She prepared his meals, cared for the house, purchased his clothing, prepared his formula, and breastfed him. She said that she objects to feeding him sugar, junk food, or allowing him to drink soda. She contends on appeal that C.T. is doing well in the learning center, which has helped

him with his vocabulary and his interaction with other children.

She argues that the award of custody to appellee is simply a way to punish her and hurt her for her actions with Hampton. She stated that the court erred in finding that while she was working and attending college classes, appellee cared for C.T. Rather, she argues that his mother took care of C.T. and that the court's award of custody is not consistent with its finding that it had genuine concerns about appellee's mother and appellee fostering a good relationship between appellant and C.T.

Our standard of review in child-custody cases is well established. We consider the evidence de novo, but will not reverse unless the trial court's findings are clearly erroneous or clearly against the preponderance of the evidence. *Valentine v. Valentine*, 2010 Ark. App. 259, 377 S.W.3d 387. Findings are clearly against the preponderance of the evidence when we are left with an irrefutable and express belief that a mistake has occurred. *Hollinger v. Hollinger*, 65 Ark.App. 110, 986 S.W.2d 105 (1999). We give due deference to the superior position of the trial court to view and judge the credibility of the witnesses. *Valentine, supra.* This deference to the trial court is even greater in cases involving child custody, as a heavier burden is placed on the trial court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the child. *Valentine, supra.* Child-custody cases are unique because there are no other cases in which the superior position of the chancellor to assess witness credibility carries as much weight. *Hepp v. Hepp*, 61 Ark.App. 240, 968 S.W.2d 62 (1998). The primary consideration in child-custody cases is the welfare and best interest of the children, all other considerations are secondary. *Valentine, supra.* Custody awards are not made to gratify, punish, or reward one parent or either parent. *Hollinger, supra.*

Giving due deference to the superior position of the trial court to weigh the credibility of the witnesses, we cannot say that its findings were clearly against the preponderance of the evidence. The court found, and properly so based upon the testimony, that appellant had not spent time with her young son. It found that her time spent on other activities, including trips out of town and volunteering, had caused her to turn the care of her child over to others. The court found appellee's testimony significant that when appellant was home, she took good care of C.T., but that during the year prior to separation, she was "never there." He noted that appellee's pursuit of an extramarital relationship led her to absent herself from C.T. and that she had left the care of C.T. to others on an excessive and unnecessary basis. The court noted that while appellant pursued other activities, appellee spent his time caring for C.T. The court also made note of appellee's work schedule, which allows him to spend a lot of time with C.T., and appellee's strong family support, which provides care for C.T. while appellee is working. Because the testimony supports these findings, we cannot say that the court erred in placing the custody of C.T. with appellee. We affirm.

MARTIN and BROWN, JJ., agree.