2013 Ark.App. 44

**Marry NICHOLSON, Appellant**

v.

**Jimmy D. HARRISON, Appellee.**

**No. CA 12–448.**

Court of Appeals of Arkansas.

Jan. 30, 2013.

Alexander Law Firm, Jacksonville, by Hubert W. Alexander, for appellant.

BRANDON J. HARRISON, Judge.

Marry Nicholson appeals the circuit court's decision to award custody of the parties' three young children to their natural father, Jimmy Harrison, and that she pay child support in the amount of $151 biweekly. We affirm the circuit court's custody decision but reduce the biweekly

child-support from $151 to $147 to comply with Administrative Order Number 10.

## Background

Attempting to stabilize an on-and-off relationship history, the parties married in July 2010. In May 2011, Harrison filed a complaint for divorce against Nicholson. When Harrison filed for divorce, he and Nicholson had been married for approximately ten months; most important to this case is that Harrison and Nicholson had three children together. When the parties began this litigation, M.H. was six years old, R.H. was four years old, and B.H. was two years old. Harrison's complaint sought custody of the three children and child support. Nicholson answered the complaint and counterclaimed that she should have custody of all the children. She also sought child support.

The circuit court held a hearing in July 2011. After receiving testimony from the parties, the court entered a temporary order granting them joint custody pending a final adjudication on the merits. A final hearing on the issues in play was held in January 2012. In a letter opinion issued in January 2012, the court granted the divorce to Harrison and awarded him custody of M.H., R.H., and B.H. The court found that it was in the children's best interest to live with their father because he was "the most stable parent." Nicholson was awarded standard visitation and ordered to pay child support based upon a net income of $350 every two weeks.

A final order was entered in February 2012, in which the court explained that "based upon the evidence and the recommendation of the Attorney *Ad Litem,* the Court finds that it is in the best interests of the minors that [Mr. Harrison] have legal and physical custody of the minors, subject to the set visitation of [Ms. Nicholson]." The court also found that Nichol-

son's net income was $350 biweekly and ordered her to pay $151 biweekly in child support. Nicholson timely appealed the child-custody and child-support decisions.

## The Child–Custody Dispute

We address Nicholson's second point on appeal first: whether the circuit court erred when it ruled, "I do not believe it is in the best interests of the children to be placed in the primary custody of Ms. Nicholson. [I]t's in their best interests to be placed in the primary custody of Mr. Harrison."

This court reviews child-custody cases de novo and will not reverse a circuit court's findings unless they are clearly erroneous. *Gibson v. Gibson,* 2010 Ark. App. 741, at 2, 2010 WL 4327099. A finding is clearly erroneous when, having reviewed the entire record before us, this court is left with a definite and firm conviction that a factual mistake was made. *Id.* Whether any of the circuit court's findings were clearly erroneous in this case turns primarily on the witnesses' and parties' credibility. We give the circuit court special deference because it has the superior position to evaluate the witnesses, their testimony, and determine what is in the best interests of minors M.H., R.H., and B.H. *Id.* The main consideration in child-custody cases is the welfare and best interests of the children; all other considerations play second fiddle. *Tribble v. Tribble,* 2011 Ark. App. 407, at 9, 384 S.W.3d 574, 579.

We affirm the circuit court's custody decision. To explain why, we will discuss a significant amount—but not all of—the material testimony that the circuit court heard.

**1. Jimmy Harrison.** Harrison informed the court that he and Marry Nicholson were married and that they had been seeing one another, off and on, for

eleven years. Harrison said he had been "living in the home with [his] children for the past six years." Harrison is an ironworker and metal-roofer by trade with thirteen years' experience. Harrison testified that he participates in the daily care of his children, including schoolwork, cooking meals for them, doing laundry, and bathing them. During part of 2010 and 2011, Harrison was laid off from work. Harrison said that, during his unemployment period, he went to the bus stop with his daughter on every school day. That point was made to distinguish his decision from the one he said Nicholson had made: "[Marry] never went out one time to wait with my daughter, she'd let her sit by herself in the dark for the bus to come and she was five, in kindergarten."

In addition, Harrison testified that, during the past five years, Nicholson had become a "drug addict" who "likes to party" and that she had left the children with him "many, many, many times" so she could "go out and socialize." According to Harrison, Nicholson has abused hydrocodone, morphine, and Xanax. "It just got worse and worse, the drugs got worse and worse, more and more pills." According to Harrison, Nicholson once held a CNA (certified nurse assistant) license but it was allegedly revoked because Nicholson "was giving Xanax and marijuana to a patient." "She kind of bragged about it a little bit." Harrison also said that on many occasions he would come home and "the baby would be in a soaky diaper[.] I come home one time where she was passed out and pills [were on] the floor, baby crawling around. It upset me a lot."

Setting aside the drug-related testimony, which the circuit court was empowered to credit or not, Harrison said that the event which triggered his decision to end the relationship with Nicholson occurred when she "went crazy" with a knife, stabbing Harrison's car tire and eventually trying to stab him, too, during an attack in April 2011. About six hours after Harrison claims to have disarmed Nicholson, she supposedly took some pills, became depressed, and "cut her wrists in front of [the] children." Harrison ultimately called the police and emergency personnel to the residence. Nicholson was then taken to a hospital. Soon thereafter, Harrison applied for and received an order of protection and was granted temporary custody of all the children. Harrison told the circuit court that he was "always afraid for the safety of the children" in Nicholson's care.

He also testified that he had plenty of family support to help him take care of the three children and that he had daycare and school accommodations in place. And Harrison told the circuit court about two DWIs Nicholson received "where she run off the road" when the children were with her. He also said that Nicholson had threatened him and their children: "she told me that if I get the children, it will be over the kids' dead bodies." Harrison testified that he was not currently staying at the marital residence because he was concerned for his safety and that of his children.

On cross-examination, Harrison admitted that he had been convicted of a felony when he was nineteen years old but that he has not been in trouble in fourteen years. Harrison denied that he has failed to permit Nicholson to visit the children. On this point, Harrison said that his understanding of the prior protective order was that Nicholson was not allowed visitation until the July 2011 custody hearing.

2. **Marry Nicholson.** For her part, Nicholson told the court that Harrison had left her and the children "probably a total of eight different times," though Harrison would visit the children and pay some child

support when he was not living with Nicholson. Nicholson denied having a "drug addiction" and rhetorically questioned why Harrison would leave the children with her if "on a daily and constant basis [I'm] laid up on Xanax and Hydrocodone and codeine and all those things[.]" Nicholson said that the pain medication she did take was prescribed to her by two separate doctors. On the "big fight in the yard that the neighbor saw," Nicholson said the event was triggered when Harrison realized that Nicholson "was serious about leaving, because everything was getting packed up and put in the van." Nicholson admitted to stabbing "the [Ford] Taurus tire with the knife" but says she then turned around and went back into the house. Nicholson also admitted to busting out the Taurus's headlights and taillights.

Nicholson testified that later the same day she and Harrison threw verbal stones at one another, which led to a physical fight. Nicholson says that things "escalated" such that Harrison slapped her, grabbed her by her hair, and dragged her through a room, injuring her during the tirade. Later that night when the kids were asleep, says Nicholson, Harrison "ended up pulling a knife and everything and cutting my arm. And I kept jerking, so there were a few slices ... in my arm, not on my wrist like he says." Nicholson told the circuit court that she eventually got a "couple of stitches in my arms and [White County Hospital] gave [her] the name" of a safe house for battered women. Nicholson also said that she had been looking for a full-time job and that, if given custody of the children, her short-term plan was to live with her father until she got her own place and her driver's license back.

**3. Arkansas Highway State Police Trooper.** Trooper Brent Bittle testified about his three encounters with Marry Nicholson between mid-March 2010 and early April 2010. He said that he arrested Nicholson "after an accident for driving while intoxicated." This was her second DWI, and Trooper Bittle confirmed that minors were in the vehicle. DWI number two was apparently drug related; Nicholson's crime-lab tests had tested positive for "benzodiazepines, cannabinoids, and opiates." Three days after he had first arrested her, the trooper met Nicholson again while she was allegedly having a grand-mal seizure. According to the trooper, who was previously "a certified Arkansas EMT paramedic" that had "quite regularly" encountered individuals who were experiencing grand-mal seizures, Nicholson faked the seizure in "an effort to avoid another DWI charge." Trooper Bittle met Nicholson a third time when he pulled her over for speeding and learned that she was driving on a suspended license; the suspension had resulted from the March 2010 DWI.

**4. Rose Bud Head Start Family Advocate.** Paula Sorrels, the family advocate at the Rose Bud Head Start, testified that she knew Marry Nicholson because Nicholson's children M.H. and R.H. attended Head Start two to three years ago. Sorrels complimented Nicholson's parenting in some ways. But Sorrels had also previously contacted DHS because she knew Nicholson was taking prescription pain medication (due to medical problems) while "driving a car and carting the kids around and stuff." Sorrels also said that "it got to the point that Marry started crying in my office because, I guess, she knew what I was saying was true." Sorrels also told the court that on at least one occasion Nicholson had confused another child at the Head Start program with her own child.

**5. The Neighbor.** Edwin Riley, a neighbor to the house where Harrison and

Nicholson lived together, testified that he had the opportunity to watch the parties parent from time to time. Among other things, Riley said that, on 28 April 2011, while he "was being a nosey neighbor and listening from [his] garage," he heard "quite a commotion." He stepped out of his garage and saw that Nicholson was acting "aggressive[ly]" towards Harrison. Riley further testified that Nicholson attacked Harrison and that Harrison "was trying to get away from her." According to Riley, Harrison "shoved her away" and told her to leave him alone. On cross-examination, Riley said that he also heard a child holler: "No, mommy, no, mommy, don't kill yourself." And then one of the children supposedly told Riley: "Smokey, Smokey, come here quick!"

Nicholson was taken to the hospital. This event required Riley to take R.H. to school the following morning, which created another wrinkle when Riley forthrightly revealed during the final hearing that he was a convicted felon ("burglary and sex offenses, things like that") and a registered sex offender in Colorado and "everywhere" else he needed to be.

**6. Harrison's Sisters.** Cathy Pettis, one of Harrison's sisters, testified on the custody dispute. She deemed her brother "a roundabout good father" because he plays with the children, helps them do their homework, and bathes them. More generally, Pettis expressed her concern that, during the time Harrison and Nicholson were together, whenever Pettis saw Nicholson, she was under the influence of alcohol or pills. Pettis also said that she and her sister saw Nicholson smoking marijuana during M.H.'s first birthday party. Pettis also told the circuit court about multiple public altercations between the Nicholson family and Harrison's family, that were, according to Pettis, fueled by Nicholson. Pettis agreed, on cross-examination, that Harrison had moved out of the home multiple times and left the children in Nicholson's care.

Another one of Harrison's sisters, Melody Coffman, testified that she had interacted with Nicholson "several" times since 2004. In addition to testifying that she "notice[d] a smell of marijuana" while observing Nicholson and some friends "going behind the shed in the backyard" during M.H.'s first birthday party—and similar conduct during M.H.'s third birthday party—Coffman said that Nicholson was "not focused on the children's needs" and that Nicholson was high "[m]ost of the time" Coffman would see her. Nicholson denied smoking marijuana during M.H.'s birthday party and said that the last time she smoked marijuana "was with Jimmy."

**7. Nicholson's Sister.** Holly Marino is Nicholson's estranged sister. Having observed Nicholson over six years, Marino also relayed stories of drug use and abuse. "In the beginning, Marry was a very good mother. She took good care of the children.... But over the years, she's gotten into drugs and alcohol. And as much as she loves the kids, she's not able to take care of them while she's under the influence." The children have, according to Marino, become scared for their mother's well being at times, such that Marino would have to reassure the children that "Mommy's fine." Marino also told the court that she was testifying on behalf of the children and that Harrison would be the most stable parent for them to be with.

**8. Nicholson's Father.** Michael Nicholson is Marry Nicholson's father, and he informed the court that his daughter was currently living in his house. Mr. Nicholson also knew that his daughter's driver's license was suspended because he and Nicholson's mother were providing the children's transportation needs. Mr. Nicholson said that, for a number of reasons, "Marry's a good mother" and that he has never seen a reason for Harrison to have

custody of the children. As for Mr. Nicholson's take on Harrison, he said that he has no reason to believe that the children were unsafe or were going to be harmed while with Harrison. Mr. Nicholson also said, however, that Harrison does not "take[ ] care of them right[.]"

On cross-examination, Mr. Nicholson said that he knew his daughter had been charged with two separate DWIs; he did not, however, agree that she had a "drinking or drug problem." He did not know that she had four vehicle accidents in 2010.

**9. The Attorney Ad Litem.** The ad litem's bottom line on the custody question was direct and unequivocal: "I cannot in good conscience state it's in the best interests of [the children] to be placed with her.... I do not believe it is in the best interests of the children to be placed in the primary custody of Ms. Nicholson. I think it's in their best interests to be placed in the primary custody of Mr. Harrison." The thrust of the ad litem's opinion was that Nicholson allowed a registered sex offender to care for her children on at least one occasion, albeit for a brief amount of time. The children's lawyer was also concerned about Nicholson's DWI history and that she had driven on a suspended license with "my clients in the car[.]"

Neither party has been perfect. But the parties' conduct as a whole, whatever it has been, was something the circuit court was charged to sift through and weigh during its best-interest analysis. The court heard ample and diverse testimony in this child-custody dispute—including live testimony from the parties, a neighbor, two of Nicholson's relatives, a state trooper, and an attorney ad litem. In fact, eleven different witnesses testified before the circuit court ruled on the custody issue. In the end, the court ruled by letter opinion:

After review of the testimony, the information submitted, and my notes please consider this my letter ruling in the above matter. [Harrison] is hereby granted the divorce.... The Court finds it in the best interests of the children that custody of the three children be with the father with standard visitation to be enjoyed by the mother. Father is the most stable parent.

Again, the circuit court had the superior opportunity to evaluate the credibility of the witnesses' testimony and the children's best interest. It also had ample proof before it on which to conclude that Harrison should have custody of the three children.

Nicholson's contention that the children were properly cared for when they were with her does not require us to reverse. Testimony on that point was part of the evidentiary mix the circuit court had to consider in its best-interest analysis. Regarding any alleged physical abuse, the court had the opportunity to consider this issue but did not expressly rule on the particulars. If Nicholson wanted specific factual findings on the alleged abuse, she should have asked the court to make them. Ark. R. Civ. P. 52.

*The Inflated Child–Support Award*

■ Did the circuit court make a calculation error when it determined that Nicholson must pay $151 in child support to Harrison? Yes, by four dollars. Because we agree with Nicholson here, we reduce the circuit court's award from $151 to $147.

Administrative Order Number 10 includes a family-support chart indicating the amount of support due depending upon the payor's income. A circuit court's order awarding child support must contain the court's determination of the payor's income, recite the amount of support required under the guidelines, and state whether the court deviated from the fami-

ly-support chart. Ark. Sup.Ct. Admin. Order No. 10(I) (2012). A party may rebut the presumption that the amount of child support calculated using the most recent revision of the chart is the appropriate amount. *Id.* If the court deviates from the rebuttable chart amount, then it must include specific written findings stating why, after considering all relevant factors, including the best interest of the child, the chart amount is unjust or inappropriate. *Id.*

Nicholson argues that the court erred in finding that her net income was $350 biweekly and that, even if that amount is correct, the court misapplied the chart. During the July 2011 hearing, Nicholson said that she was currently working twenty-five hours a week and that she hoped to start a forty-hour per-week job soon. Nicholson also submitted a financial-means affidavit that reported a weekly net pay of $120.53 ($241.06 biweekly). But during the final hearing held six months later, in January 2012, Nicholson said that she was currently "working side jobs" like splitting wood for the Bryant Tree Service and housecleaning. She testified that her income was steady and that "every two weeks I bring in at least [$]350." No one put on additional proof of Nicholson's income before the circuit court—like an updated financial-means affidavit or paycheck stubs.

Nicholson concedes in her brief that "[t]here was some testimony, admittedly, that Ms. Nicholson was earning approximately $350 every two weeks." She says, however, that this was "obviously her gross income, not net." We disagree. Nicholson's proof on net versus gross income was not so obvious that we will conclude that the circuit court made a firm and definite mistake on Nicholson's biweekly income. The court's finding on income mirrors Nicholson's own testimony that she brought in $350 every two weeks.

We agree with Nicholson, however, that the court erred by setting the amount of child support at $151. That was too much. The family-support chart sets child support at $147 for a payor with three children and a net biweekly income of $340 and $155 for a payor with three children and a net biweekly income of $360. Administrative Order Number 10 requires the court to "[u]se the lower figure on the chart for income to determine support. Do not interpolate (i.e., use the $200.00 amount for all income pay between $200.00 and $210.00 per week.)" Ark. Sup.Ct. Admin. Order No. 10(III)(a) (2012). When applied to this case, Section III(a)'s ban on interpolation means the court erred when it ordered a child-support amount of $151 on a net biweekly income of $350. We acknowledge that a circuit court may deviate from the family-support chart under particular circumstances, but none of those circumstances are present here. We hereby modify the court's order and reduce the child-support amount from $151 to $147.

### Conclusion

The circuit court did not clearly err when it determined that the best interest of M.H., R.H., and B.H. required that Harrison take custody of the parties' minor children, so we affirm on this point. The court did err when it determined the child-support amount under Administrative Order Number 10. We therefore modify the court's order on this point: Nicholson must pay only $147 in child support. No remand is necessary given this record and the straightforward application of Administrative Order Number 10.

Affirmed as modified.

WYNNE and GRUBER, JJ., agree.