

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-14-638

| | | |
|---|---|---|
| | | Opinion Delivered MARCH 4, 2015 |
| JESSICA BLACK | APPELLANT | APPEAL FROM THE CLARK COUNTY CIRCUIT COURT [NO. DR-13-108] |
| V. | | |
| BRENTLEY BLACK | | HONORABLE ROBERT MCCALLUM, JUDGE |
| | APPELLEE | AFFIRMED |

**KENNETH S. HIXSON, Judge**

This is an appeal between divorced parents over custody of their child WWB, born in January 2008. Appellant Jessica Black and appellee Brentley ("Brent") Black were married in 1999 and were divorced by a decree issued by the Clark County Circuit Court in April 2014. The parties each sought primary custody of the child, although they shared approximately equal time with the child following separation in May 2013 until their divorce. After a full day's hearing in March 2014, the trial court awarded primary custody to Brent, and Jessica appeals, arguing that the trial court clearly erred in granting custody to Brent and not her, or alternatively, in not awarding joint custody. We hold that the trial court did not clearly err and affirm.

With regard to custody and visitation, the primary consideration is the welfare and best interest of the child involved; all other considerations are secondary. *Baber v. Baber*, 2011 Ark.



40, 378 S.W.3d 699; *Hicks v. Cook*, 103 Ark. App. 207, 288 S.W.3d 244 (2008). On appeal, we perform a de novo review, but we will not reverse unless the findings are clearly erroneous. *Taylor v. Taylor*, 353 Ark. 69, 110 S.W.3d 731 (2003); *Ross v. Ross*, 2010 Ark. App. 497. This necessarily turns in large part upon credibility determinations, and we give special deference to the superior position of the trial judge to evaluate the witnesses, their testimony, and the child's best interest. *Sharp v. Keeler*, 99 Ark. App. 42, 256 S.W.3d 528 (2007). There are no cases in which the superior position, ability, and opportunity of the trial judge to observe the parties carry as great a weight as those involving children. *Judkins v. Duvall*, 97 Ark. App. 260, 248 S.W.3d 492 (2007). We do not reverse unless there is clear error, meaning that after conducting de novo review we are left with a definite and firm conviction that a mistake was made. *Hollinger v. Hollinger*, 65 Ark. App. 110, 986 S.W.2d 105 (1999).

*Factual Background and Testimony*

The parties lived in Arkadelphia, where each went to college at Ouachita Baptist University and each attained accounting degrees. Each party had a full-time job, although Jessica was a stay-at-home mother for a period of time after WWB's birth. By the date of the divorce hearing in March 2014, a substantial portion of the sizable marital assets and debts were divided by agreement of the parties. The remainder of the marital assets was subject to litigation and equitably divided. The division of assets and debts and the award of alimony are not at issue on appeal. The parties agreed that Brent would remain in the marital home, where the parties lived almost all of WWB's life. This was where WWB had his room, toys,

 

and pets. During the parties' separation, Jessica had moved to the parties' houseboat where she resided until the divorce.

The trial court heard testimony from Jessica and Brent along with Jessica's best friend Rebecca Davidson, Brent's mother Elaine Black, and Michael Connely, a friend of the parties. At the conclusion of the evidence, the trial judge recessed court but returned the same day to issue his ruling from the bench. He noted that because these were both loving, caring parents, the custody decision was harder.

Jessica testified that she was a stay-at-home mother to WWB for about the first three years of his life, and then she returned to part-time employment. She returned to full-time employment when WWB was age five. WWB went to daycare sporadically when Jessica worked part time, and he attended daycare full time when she went to full-time work. WWB started kindergarten in August 2013.

Jessica testified she took their son to swimming lessons, karate lessons, birthday parties, play dates, church activities, and did the typical care taking for WWB when she was home with him. Jessica testified that she took WWB to church and said that she actively worked toward WWB having a sound religious upbringing. Jessica stated that her extended family lived in Iowa and that her full-time job provided five vacation days annually, which she would use if WWB became ill. She also testified that her employer permitted her to have WWB with her at the office.

Jessica agreed that she and Brent had similar disciplinary styles with WWB, taking away privileges, giving rewards, or sometimes spanking. Jessica stated that although Brent was a

good parent who loved his son, she did have some concerns. She claimed that Brent did not always put WWB in a booster seat when they were in the car, and she also believed that Brent would text while driving. She said that Brent was not as good about making sure WWB was wearing a life jacket when on the water, even though she agreed WWB was a good swimmer. She worried about Brent letting WWB ride in a car with another parent who had been diagnosed with epilepsy.

Jessica acknowledged that she and Brent had disagreements over simple things like WWB's clothing, shoes, haircuts, and which church WWB was permitted to attend. She said Brent was nitpicking and controlling. She was displeased with how cold and standoffish Brent was to her in front of WWB, one time even yelling at her and calling her a "psycho." Jessica alleged that many years prior, Brent verbally abused her and physically held her down against her will.

Jessica testified that she had made a mistake of having an affair during the marriage, but she attempted to explain that it was a consequence of all the hurtful things Brent had said to her and how he rejected her. The man with whom she had the affair also had a houseboat near theirs. The evidence indicated that WWB had met the man with whom she was having the affair.

Jessica told the trial judge more than once, "I am asking for custody of WWB." She also said that she had no plans to move away from Arkadelphia, although she needed to find a house once she knew how the marital estate would be divided. She agreed that people suggested that she move to Dallas to be near her mother, but she did not want to do that

because that would compromise Brent's time with WWB. She said that she was willing to work out a visitation schedule so that Brent saw WWB as much as possible. Jessica's testimony indicated that Brent was hard to work with on even little issues, so she most often gave in to his wishes.

On cross-examination, Jessica admitted that she was tardy getting WWB to school a few times, and there were quite a few times that she was behind schedule in picking WWB up from school. She explained that everyone makes mistakes as parents sometimes. She denied Brent's allegation that she left WWB alone on the houseboat for about thirty minutes, denied drinking when WWB was with her on the houseboat, and when WWB had his life jacket off, she said that he was not following her rules. Jessica agreed that WWB charged about $1000 on a credit card on her iPad while he was in her care, but she did not realize that her password remained open on her computer while he was playing with it. She also admitted that she started smoking in 2013 but explained that it was the result of the stress of divorce and that she does not smoke around WWB.

On the other hand, Brent testified that he was seeking primary custody, meaning that if he and Jessica could not agree on a decision regarding WWB, he would be the decision maker. Brent stated his intention of Jessica having as much visitation as possible, but he had no specific schedule to suggest.

Brent stated that he was the chief financial officer at a bank and that his job was extremely flexible and doable by internet, permitting him to come and go as he pleased as long as his work was accomplished. This meant that Brent was able to attend all of WWB's

SLIP OPINION

activities and stay at home if WWB became ill. He stated that he typically picked up WWB from school on his days, and he would take WWB to work with him too. Brent had a regular schedule with WWB for homework, play time, dinner, bathing, and bedtime. Brent was actively involved in WWB's daily life, attending school lunches on occasion and coaching his soccer team as well as regularly taking WWB to church and to as many Razorback football games played in Fayetteville as possible. Brent explained that he had at least forty relatives (including his mother) within an hour of Arkadelphia and that they were all tightknit and very supportive. He stated that he had been as flexible as possible with Jessica regarding any request to change visitation or pick up times. Brent expressed concern that if Jessica was awarded custody, she would leave town with WWB. He felt certain because she did not have any family in the area, and she had told him and others that she wanted to leave. Brent felt that this would "destroy" their son because his family, friends, school, and "everything he knows is here." Brent did not want to be relegated to every other weekend with his son, and he was concerned about Jessica's decision-making skills. He was not asking for child support.

Jessica's best friend Rebecca Davidson testified that she observed the family weekly and even vacationed sometimes with the family. Rebecca believed Jessica to have always been WWB's primary caregiver, although she also opined that Brent was a good father. She had no qualms about leaving her own daughter with WWB in Brent's care. Rebecca stated that she was present for arguments "over a lot of little petty things" but that she heard Brent say mean things to Jessica.

Brent's mother, Elaine Black, testified as well. She lived in Mt. Ida and saw WWB often. Their family would meet at her house quite a bit for family gatherings. She thought her son was a wonderful father and Jessica a good mother with whom she still regularly communicated. Elaine was worried because Jessica told her that she did not like Arkadelphia and wanted to move. Elaine opined that Jessica's unhappiness had clouded her judgment in many ways.

Michael Connely testified that he was a friend of the parties, and he also had a houseboat at the same marina. Michael recounted a day in August 2013 when WWB was with Jessica on the houseboat, but WWB spent most of the time by himself with no one watching him, the majority of the time without wearing a life jacket. Michael agreed that he had observed Jessica drinking out on the dock, but he had also seen Brent drink too when WWB was present.

It was with this background and competing evidence that the trial court made its "hard decision." The trial court's findings were memorialized in the final decree. The trial court found that both parties demonstrated the desire and capacity to care for their child and that both were actively involved with their child's activities. Both parents were college educated and employed full time. The decree noted that neither party advocated for joint custody, nor would such an award be in the child's best interest. The trial court awarded primary custody to Brent as being in WWB's best interest. The trial court specifically stated that it reached its decision through a deliberative process relying on several factors, none of which were considered conclusive but when combined together showed that Brent offered a more stable

7

and settled situation for the child. The factors the court considered were Brent's overall more stable lifestyle; Brent having extended family to help with WWB's care; Brent's retention of the family home where WWB had his room and pets; Brent having more flexibility with his job that permitted him to be available for daily care taking; evidence of Jessica's marital infidelity and related activities that reflected negatively on her judgment and ability to make informed healthy decisions where WWB was concerned; Jessica's failure to get WWB to school on time or to pick him up from school in a timely fashion; Jessica having recently taken up smoking cigarettes; and WWB having made a significant credit-card charge while in Jessica's care.

With regard to Jessica's visitation rights, the trial judge recited his expectation that Brent would permit additional reasonable visitation and work with Jessica to ensure that she had as much time with WWB as she could. The trial judge noted Brent's obligation to maintain communication and keep her informed of medical and dental care and treatment, school and church events, and any other matter involving WWB. Both parties were ordered to "act civilly to each other and work in the best interest of the minor child." Jessica's visitation was ordered to include every spring break, two weeks in the months of June/July/August, as well as specified standardized visitation. This appeal followed the filing of the decree.

*Primary Custody*

Jessica argues that the trial court relied on irrelevant factors in making a custody determination and failed to take into consideration the fact that she was a stay-at-home

SLIP OPINION

mother for WWB's first three years of life and WWB's primary care giver during the bulk of the marriage. Jessica adds that the trial court wrongly ignored evidence that Brent was verbally and physically abusive to Jessica during the marriage. We disagree.

On this record, it is abundantly clear that the trial court carefully considered the evidence presented. There was evidence that Jessica was a good mother and that Brent was a good father; and thus, it is not clearly erroneous to find the child's best interest to be in his father's primary custody. It is not our role to conduct a trial de novo and consider questions of fact and issues of law as if there had been no trial. *Tanner v. Kadusheva*, 2011 Ark. App. 379, 389 S.W.3d 635. The fact that one parent is the primary caretaker of the child during the marriage is not in and of itself determinative, although relevant and worthy of consideration. *Thompson v. Thompson*, 63 Ark. App. 89, 974 S.W.2d 494 (1998). The trial court made clear that it considered and deliberated on all the evidence in making the custody determination, and Jessica does not demonstrate a failure of the trial court to do so. Custody awards are not made to punish or reward either parent. *Stone v. Sneed*, 54 Ark. App. 11, 923 S.W.2d 282 (1996). The trial court went to great lengths to state that Jessica was not being punished for having an affair during the marriage, but rather this was a factor to consider as it bore on her ability to make sound judgments where her son was concerned. The trial court was not required to make specific findings on every allegation that each party made against the other, and if Jessica wanted such findings, she could have asked for them pursuant to Arkansas Rule of Civil Procedure 52. *Id.* Jessica ultimately admits in her brief that the record contains testimony both favorable and unfavorable to both parties. The facts in this case made

the custody decision a difficult one, as noted by the trial judge. The trial court did not clearly

err in awarding primary custody of the child to Brent. *See Nicholson v. Harrison*, 2013 Ark.

App. 44, 425 S.W.3d 851. We are simply not left with a distinct and firm impression that a

mistake was made.

*Joint Custody*

Jessica argues in the alternative that the trial court clearly erred in not awarding the

parties joint custody, noting that in 2013 our legislature amended Arkansas Code Annotated

section 9-13-101 to state that an award of joint custody is favored in Arkansas. The statute

reads in pertinent part:

> (a)(1)(A)(iii) In a divorce action, the award of joint custody is favored in
> Arkansas.
>
> . . . .
>
> (5) As used in this section, "joint custody" means the approximate and
> reasonable equal division of time with the child by both parents and
> individually as agreed to by the parents or as ordered by the court.
> (b)(1)(A)(i) When in the best interest of a child, custody shall be awarded in
> such a way so as to assure the frequent and continuing contact of the child
> with both parents consistent with subdivision (a)(1)(A) of this section.
>> (ii) To this effect, the circuit court may consider awarding joint
>> custody of a child to the parents in making an order for custody.

The statute does indicate that joint custody is favored and may be considered by the trial

court, but here Jessica made no request for joint custody. There were competing petitions

for full custody. Jessica alleged in her complaint that she "is the fit and proper person to have

the care, custody, and control of the parties' minor child subject to [Brent's] reasonable

visitation." Brent made the same allegation and disputed that Jessica should be declared the

custodian. The trial court was faced with determining which parent was better suited to be the primary custodian. The trial court recited in its order:

> Neither party advocated for joint custody, and proof was introduced showing the parties have difficulty agreeing on basic decisions involving the care and activities of the minor child. Based on the evidence presented at the hearing, the Court finds that joint custody would not be in the best interest of the minor child.

We hold that the trial court's findings on this issue are not clearly erroneous because the best interest of the child would not be served by such an award.

Jessica also states as part of her argument that the trial court erred in failing to award her equal visitation, as contemplated by the statute. While the visitation awarded by the trial court may have not been equal, the trial court awarded Jessica visitation that was more expansive than that typically ordered for a child WWB's age and more expansive than the standard visitation award used in that circuit. Further, the trial court specifically stated the expectation that Brent would—as he stated in his testimony—cooperate and provide additional visitation in keeping with WWB's best interest. This order is in compliance with the principle of providing frequent and continuing contact between the parents and the child. When visitation is at issue, the circuit court's decision will not be reversed absent an abuse of discretion. *Oldham v. Morgan*, 372 Ark. 159, 271 S.W.3d 507 (2008). We hold that Jessica has not demonstrated an abuse of the trial court's discretion.

The trial court's order is affirmed.

ABRAMSON and HOOFMAN, JJ., agree.

*Hilburn, Calhoon, Harper, Pruniski & Calhoun, Ltd.*, by: *Sam Hilburn*, *Scott Hilburn*, and *Natalie Dickson*, for appellant.

*Wright, Berry, Moore & White, P.A.*, by: *Gina White*, *Rodney P. Moore*, and *Travis Berry*, for appellee.