

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-15-67

| | | |
|---|---|---|
| CANDISE MICHELLE MONTEMAYOR | | Opinion Delivered October 21, 2015 |
| | APPELLANT | |
| V. | | APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT [NO. DR–2013–333 (II)] |
| DAVE ELLISON ROSEN | | HONORABLE ANNIE HENDRICKS, |
| | APPELLEE | JUDGE |
| | | AFFIRMED |

## CLIFF HOOFMAN, Judge

Appellant Candise Michelle Montemayor appeals from the circuit court's order awarding joint custody of the parties' son, M.R., to her and the child's father, appellee Dave Ellison Rosen. On appeal, Montemayor argues that the circuit court clearly erred by awarding the parties joint custody instead of awarding her sole custody of M.R. We affirm.

The parties to this appeal were never married but were in a romantic relationship for approximately eighteen months. They lived together in Fort Smith, Arkansas, and M.R. was born on October 17, 2012. The relationship ended in early April 2013, and Rosen filed a petition for paternity, requesting that he be declared the father of M.R. and that he be awarded primary custody of the child. He attached an acknowledgment of paternity that was executed by both parties shortly after M.R.'s birth. Rosen also filed an ex parte petition for temporary emergency custody, alleging that Montemayor had threatened to leave Arkansas

SLIP OPINION

with M.R. in order to keep Rosen from having contact with his child. Rosen further alleged that he had been the primary caretaker for M.R. and that Montemayor was mentally unstable and provided an inappropriate and unhealthy environment for the child.

Montemayor filed an answer and a counterpetition for custody, alleging that she was the proper person to have custody of M.R. She indicated that she was in the process of moving to Texas at the time she was served with Rosen's petition, and she sought permission from the circuit court to relocate with M.R. She also requested that Rosen's visitation be restricted and listed prior criminal proceedings in Oregon in which Rosen had been involved.

A temporary custody hearing was held on May 9, 2013. Rosen testified that he had been very involved in M.R.'s care and that he had stayed at home with the child when Montemayor returned to work after maternity leave. He testified that he left Montemayor in April 2013 because she was verbally abusive to him. Rosen stated that Montemayor had exhibited bouts of rage and hysteria in front of M.R. and that she had also physically assaulted him while he was holding the child. He stated that Montemayor had attempted suicide when she lived in Oregon, that she was subsequently hospitalized, and that she had been diagnosed with bipolar disorder. He further indicated that her older children, who now lived with their father, had previously been removed from her custody due to her mental instability. Rosen testified that he did not take M.R. with him when he left Montemayor because he was concerned about the legal ramifications of not having had his paternity formally established. After their relationship ended, Rosen stated that Montemayor repeatedly called and texted him, threatening to move with M.R. to Texas if he did not reconcile with her. He testified



that she also came to his workplace and relayed the same threat to his boss.

Subsequent to the filing of his petition for paternity and for custody, Rosen stated that Montemayor had not contacted him and that he did not know where she and M.R. were currently residing. Rosen testified that he was very concerned about M.R. due to Montemayor's mental instability and violent outbursts and that he wished to have primary custody, with Montemayor receiving standard visitation. He indicated that he had a great job, which was very flexible, and that he had arranged for childcare if necessary. Rosen admitted that he had been convicted of multiple felonies in 2007, including burglary, theft, unlawful possession of a firearm, and possession of methamphetamine; however, he indicated that the majority of his convictions resulted from a single, isolated incident. He testified that he had successfully completed his probation on those charges, that he had rededicated his life and moved on, and that he had not been in trouble since that time. Rosen also agreed to take a drug test to demonstrate that he no longer had a substance-abuse problem.

Montemayor testified that she and M.R. had moved to Texas in April and were currently living with her grandmother. Montemayor stated that she was aware that she was prohibited by Administrative Order No. 1, which had been attached to the petition and summons, from leaving the state with the child but claimed that she had no choice because she had been evicted from her residence and had nowhere else to stay. She denied threatening Rosen that she would leave with M.R. Montemayor also denied Rosen's allegations that she had been verbally abusive or that she had displayed violent outbursts; instead, she claimed that Rosen had physically assaulted her on numerous occasions during

3

her pregnancy. She further stated that Rosen had used methamphetamine while she was pregnant and that he began drinking heavily after M.R. was born. Montemayor testified that, on one occasion, Rosen had taken M.R. in the car, and when he returned, he forgot that the child was still in the car until Montemayor questioned him. She claimed that she was unaware of Rosen's 2007 convictions until after she became pregnant. Montemayor testified that she would not let Rosen have unsupervised or overnight visits after their break up because of her concerns about Rosen's alcohol use.

Darcy Bates, who was M.R.'s babysitter both before and after the parties' relationship had ended, testified that the child appeared to be well cared for. Although Montemayor had mentioned her concerns about Rosen's drinking, Bates indicated that she had never witnessed any issues in that regard. Bates testified that she had no concerns about either party's parenting abilities.

At the conclusion of the temporary hearing, the circuit court found that Rosen had established paternity of M.R. and that Montemayor had violated Administrative Order No. 1 by removing M.R. from Arkansas. The court ordered Montemayor to return the child to this state pending the final custody hearing and found that it was in M.R.'s best interest for the parties to share custody on a temporary basis. Thus, Rosen was to have the child on his days off from work, from Saturday evening through Tuesday evening, and Montemayor was to have custody from Tuesday evening through Saturday evening. The court also ordered that both parties complete a psychological evaluation and a drug-and-alcohol assessment.

The final custody hearing was held on August 14, 2014. Rosen testified that since the

temporary hearing, there had been some issues with the parties' custody exchanges due to Montemayor's hostility, and they agreed to move the exchanges to the police department. He also stated that Montemayor had called the police for a welfare check on three occasions when he had custody of M.R. According to Rosen, Montemayor would phone his home ten to twelve times during the course of a day, becoming increasingly belligerent, and he would finally refuse to answer the phone. He further testified that Montemayor had driven by his home at least fifty times and that his neighbors had seen her in his yard when he was at work. Rosen introduced copies of multiple texts between the parties containing threatening and hostile statements by Montemayor. For example, in one text, Montemayor stated, "I hate your guts David." In another text discussing her issues with M.R.'s behavior, she responded to Rosen's reference to his home with, "This is not his home and it is offensive that you would use that term. Do not confuse my child. He has one home but is temporarily being dragged between." Rosen testified that Montemayor was also very paranoid that he had a girlfriend, which he denied; he stated that she would text him asking why he had an extra car seat in his car, who owned an unfamiliar vehicle that was parked in his driveway, and why did M.R. smell like women's perfume.

Rosen testified that he had always been respectful and cordial in their communications despite Montemayor's hostility toward him. He stated that he had changed his work schedule to accommodate Montemayor when she needed him to keep M.R. for several days, that he had bought flowers for M.R. to give Montemayor on Mother's Day, and that he had always kept her informed of any necessary information regarding their son. Rosen denied that he

had ever been violent toward Montemayor, and while he admitted that he had been involved in tumultuous relationships with ex-girlfriends, resulting in several protective orders, he denied that he had ever been physically abusive. He testified that these were mistakes in his past, that he had "found the Lord again," and that his priorities had changed significantly since his son had been born. Rosen admitted that he had received a prescription for marijuana pills from his family doctor in Oregon in January 2013; however, he stated that it was for back pain, that the prescription was for only ten pills, and that he had not taken any since that time. He confirmed that he had passed his recent drug tests and that he had obtained a drug-and-alcohol assessment, which concluded that he had no significant substance-abuse problem and that he did not need alcohol or drug treatment.

While Rosen agreed that physical custody of M.R. needed to be shared by both parties, he testified that he wanted primary legal custody because of their fundamental differences toward religion and medical care. He indicated that he attends church each Sunday and that he had enrolled M.R. in the church preschool program. In addition, he testified that he had kept M.R.'s immunizations up to date, while Montemayor had wanted to delay them. Rosen stated that it was in M.R.'s best interest for both parents to be involved in his life and that he was the one who would best facilitate equal access to both parents, while Montemayor would abuse her custodial rights if she were to receive primary custody.

Fort Smith Police Officer John Little testified that he had been called to Rosen's residence on three occasions in August and September 2013. On one occasion, Montemayor refused to leave the home until she found out if M.R. was okay. On the other two occasions,

Montemayor had requested a welfare check. On all three visits to Rosen's home, Little testified that M.R. was fine and that he had no concerns about the child. Little further indicated that Rosen was cooperative and that the home was clean and appropriate. According to Little, the welfare checks were not warranted, and he advised Rosen that he could show the incident reports to the prosecutor to see if there were grounds for harassment.

Rosen's boss, Paul Weisenfels, testified that Rosen was an excellent employee and that he had not had any suspicions of drug use or alcoholism by Rosen, despite being aware of Rosen's history. Weisenfels stated that he was also M.R.'s godfather and indicated that M.R. and Rosen were bonded to one another and had a strong relationship. According to Weisenfels, Rosen was very attentive to M.R. and was able to provide for all of the child's needs. Vicky Cowen, Rosen's neighbor, also testified about the strong bond between M.R. and his dad. Cowen further stated that on one occasion, she saw Montemayor drive down their street and take pictures of Cowen's daughter while they were outside getting a carseat out of their car, which had been parked in front of Rosen's house.

Montemayor testified that since the temporary hearing, she had moved back to Fort Smith, acquired her own residence, and was employed at the public library. She indicated that she had attempted to follow the temporary-custody order "to a T," so she agreed that she had not been flexible with Rosen about changing the time for their exchange based on his work schedule, even though it would have given her additional time with her son. She stated that she did not have custody of her older two children, although she did have visitation. She admitted that she was behind on her child-support payments for those children. Montemayor

SLIP OPINION

denied having been diagnosed with bipolar disorder or having attempted suicide. She explained that she had been hospitalized in Oregon on three separate occasions due to her grief after one of her children died from a heart defect. Montemayor also entered into evidence her psychological-evaluation report, which did not diagnose her with any specific mental disorder. Montemayor admitted that she had requested a welfare check on Rosen's home on several occasions, but she claimed that M.R. had been sick and that she was concerned because Rosen would not answer the phone. She also admitted that she had driven by his residence and had taken photos, due to her concern for who was around M.R. while he was in Rosen's custody.

Montemayor stated that she was concerned about Rosen having custody because of his drug and alcohol use, as well as his physical and verbal abuse of her. She introduced pictures of bruises and scratches that she claimed had been caused by Rosen. She admitted that she did not like Rosen, although she stated that she had been civil to him and that she would communicate with him when it was necessary concerning M.R. Montemayor further indicated that she would follow whatever visitation schedule the court ordered. If Rosen had recovered from his drug and alcohol addiction and if he received treatment for anger management, Montemayor agreed that Rosen could be a good role model for M.R. She testified that she should be awarded custody, however, because she loved being a mother, she had not spent a night away from her son until it was court ordered, she did not have a criminal background, and she had followed all court orders since the temporary-custody order.

8

Sandra LaMar, Montemayor's previous boss, testified that she had seen Montemayor interacting with her children and that Montemayor is a very loving and protective mother, who is concerned for her children's welfare. She also indicated that Montemayor was a dedicated employee and got along well with her coworkers. Montemayor's current supervisor at the library, Robin Denimzz, testified that she had also witnessed Montemayor with M.R., indicating that she treats her son with compassion and kindness and that he is a happy child. Denimzz further stated that Montemayor is patient and kind with all of the library patrons.

Following the hearing, the circuit court took the matter under advisement but noted that it had "real concerns with, quite frankly, the venom and anger of the defendant," which the court found had been demonstrated in every comment Montemayor made about Rosen. On October 7, 2014, the circuit court entered an order awarding joint physical custody of M.R. to the parties, with Rosen being considered the primary custodian and the final decision maker for educational, medical, and religious decisions. The court found that Rosen was the person most likely to ensure frequent and continuing visitation between M.R. and Montemayor and further found that Montemayor had demonstrated an inability to coparent and cooperate with Rosen. Montemayor has timely appealed the circuit court's decision.

This court reviews child-custody cases de novo and will not reverse a circuit court's findings unless they are clearly erroneous. *Gibson v. Gibson*, 2010 Ark. App. 741. A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been committed. *Id.* Because the question of whether the trial court's findings are clearly erroneous turns largely on the credibility of the witnesses,

we give special deference to the superior position of the trial judge to evaluate the witnesses, their testimony, and the child's best interest. *Id.* In fact, there are no cases in which the superior position, ability, and opportunity of the trial judge to observe the parties carry as great a weight as those involving minor children. *Id.*

The primary consideration in child–custody cases is the welfare and best interest of the children; all other considerations are secondary. *Fox v. Fox*, 2015 Ark. App. 367, 465 S.W.3d 18. Although joint custody has been disfavored in Arkansas in the past, Act 1156 of 2013 amended Arkansas Code Annotated section 9-13-101 to state that an award of joint custody is now favored in divorce proceedings. *Id.* When in the child's best interest, custody should be awarded in such a way as to assure the frequent and continuing contact of the child with both parents. Ark. Code Ann. § 9-13-101(b)(1)(A)(i) (Supp. 2013). Other factors that may be considered in determining what is in the best interest of the child include the psychological relationship between the parents and the child, the need for stability and continuity in the child's relationship with parents and siblings, the past conduct of the parents toward the child, and the reasonable preference of the child. *Rector v. Rector*, 58 Ark. App. 132, 947 S.W.2d 389 (1997).

Montemayor argues on appeal that the circuit court clearly erred in awarding the parties joint custody, instead of awarding her sole custody, in light of Rosen's criminal convictions, drug use, alcohol consumption, and violent actions and tendencies. She contends that Rosen was convicted of thirteen felonies, while she has no convictions of any sort. She also argues that Rosen attempted to discharge his criminal fines and costs in a bankruptcy

proceeding in Oregon and that, furthermore, he was not truthful in that proceeding because he had represented that he had been domiciled or had a residence in that state for 180 days immediately preceding the petition, while he stated to the circuit court in this case that he had been a resident of Arkansas during that time period. Montemayor also points to the evidence that Rosen had been the subject of several no-contact orders by previous girlfriends and asserts that this evidence corroborates her testimony about the abuse she claims to have suffered at the hands of Rosen. As to the drug-and-alcohol issue, Montemayor contends that her testimony as to Rosen's methamphetamine use during their relationship, as well as his admission to receiving a prescription for marijuana in January 2013, demonstrates that his drug usage is not limited to his past as he represented to the circuit court. In addition, Montemayor argues that the circuit court overlooked Rosen's drinking habits, as well as the evidence that Rosen was the one who had refused to cooperate with her regarding M.R.

While there was evidence presented by Montemayor at the custody hearings on each of the concerns she raises in regard to Rosen's parental fitness, there was also evidence presented by Rosen that either contradicted or explained each of these concerns. Further, Rosen admitted to having made mistakes in the past, but he testified that his priorities had changed since his son had been born. While neither party's conduct was perfect, the circuit court was required to weigh the conflicting evidence presented at the hearings and was in the superior position to evaluate the credibility of the witnesses. *See Nicholson v. Harrison*, 2013 Ark. App. 44, 425 S.W.3d 851 (affirming trial court's award of custody to father despite mother's allegations of physical abuse). It is not this court's role to conduct a trial de novo

and to consider questions of fact and issues of law as if there had been no trial. *Black v. Black*, 2015 Ark. App. 153, 456 S.W.3d 773. The circuit court in this case specifically noted its concern about Montemayor's anger toward Rosen and found that Rosen would better ensure frequent and continuing contact between M.R. and his mother. Accordingly, we cannot hold that the circuit court's decision was clearly erroneous, and we affirm the award of joint custody.

Affirmed.

GLADWIN, C.J., and WHITEAKER, J., agree.

*Gean, Gean & Gean*, by: *Roy Gean III*, for appellant.

*Aubrey L. Barr*, for appellee.