Cite as 2024 Ark. App. 199

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-22-446

|  |  |
|---|---|
| | **Opinion Delivered** March 13, 2024 |
| ALISON DOREY (NOW THEOBOLD)<br>APPELLANT | APPEAL FROM THE CRAWFORD COUNTY CIRCUIT COURT [NO. 17DR-19-147] |
| V. | |
| | HONORABLE MARC MCCUNE, JUDGE |
| ADAM GABRIEL DOREY<br>APPELLEE | REVERSED |

**KENNETH S. HIXSON, Judge**

This appeal arises from a postdivorce dispute between appellant Alison Dorey (now Theobold) and appellee Adam Gabriel Dorey. The order on appeal terminated Adam's alimony obligation as originally ordered in the divorce decree and gave Adam credit for the alimony he already paid against the parties' joint marital debt. On appeal from the order, Alison argues that the trial court erred in terminating Adam's alimony obligation and in converting his alimony payments to payments on the joint debt, and the manner in which the trial court altered and amended the divorce decree requires reversal. Because we conclude that the trial court erred in modifying the alimony provision in the divorce decree sua sponte and without proper notice to Alison, we reverse.

I. *Facts and Procedural History*

Alison and Adam were married in May 2006 and have three minor children together. On March 19, 2019, Alison filed a pro se complaint for divorce and attached a property settlement agreement (PSA) that she asked to be incorporated and merged into the divorce decree. Both parties signed the PSA, which contained the following provisions. Alison was awarded primary custody of their children and Adam was to pay $993 in monthly child support. Alison was awarded the parties' marital home in Van Buren subject to the debt. The parties' rental house in Rogers was to be sold with the proceeds of the sale allocated against the parties' joint debt, and Adam was responsible for the debt and upkeep expenses on the rental house until it sold. The vehicles were divided between the parties with each party being responsible for the debt on the vehicle he or she was awarded, and the parties were made individually responsible for the debt in their own names. The parties were also awarded any retirement accounts in their own names. Finally, the PSA provided that neither party would pay alimony.

Alison prepared a divorce decree and attached the accompanying PSA, but these were twice rejected by the trial court due to improper form. Thus, Alison hired an attorney to assist. Alison's attorney drafted a divorce decree, which was signed and approved by both Alison and Adam. The divorce decree signed by the parties contained various provisions, but the aforementioned PSA was not attached nor was it made part of the decree.

The divorce decree was entered by the trial court on August 6, 2019. The relevant provisions in the divorce decree signed by the parties were substantially the same as the provisions of the previously signed PSA, with the exception of the following provision: "That

2

[Adam] shall pay spousal support to [Alison] in the amount of $1000 per month for the next five years." Although the divorce decree did not set forth the amount of the parties' joint debt, the parties agree that their joint debt at the time of divorce was $39,840.28.

Adam consistently made the alimony payments until Alison remarried in March 2021, and he made one $500 alimony payment after that. Adam paid a total of $19,500 in alimony before he stopped paying.

On July 28, 2021, Alison filed a motion for contempt against Adam.[1] In her motion, Alison alleged that Adam should be held in contempt because (1) he failed to pay for the upkeep on the rental house, which resulted in it being sold for less than market value; (2) he failed to make any payments on the parties' joint debt; (3) he failed to make the payments on his vehicle (and Alison's name was still on the debt); and (4) he failed to pay alimony since April 2021.

On July 29, 2021, Adam filed a response to Alison's motion for contempt, generally denying her allegations. On April 13, 2022, Adam filed an amended response, which was the same as the first response but added "[t]hat the defendant is no longer obligated to pay alimony because the plaintiff remarried on or about March 27, 2021."

Also on April 13, 2022 (which was thirteen days before the hearing on Alison's contempt motion), Alison filed a "Trial Brief." In her trial brief, Alison argued that because

---

[1]Also intertwined in the postdivorce litigation was Adam's motion to modify custody. However, the trial court denied Adam's motion to modify custody, Adam has not appealed from that ruling, and there is no issue regarding custody in this appeal.

the alimony was for a set term agreed upon by the parties, it did not terminate upon her remarriage. Alison cited *Martens v. Blasingame*, 2018 Ark. App. 96, at 5, 541 S.W.3d 492, 495, where we wrote:

> In *Artman v. Hoy*, 370 Ark. 131, 257 S.W.3d 864 (2007), our supreme court held that section 9-12-312, which provides for the automatic termination of alimony when the receiving spouse remarries or cohabitates, does not apply to an agreement for the payment of alimony over a term of years, even when the decree does not specifically address the effect of remarriage or cohabitation on the alimony obligation. Instead, when the parties agree to alimony for a designated period of time, it follows that there has been an agreement as contemplated by section 9-12-312(a), such that the automatic-termination provision regarding remarriage or cohabitation is not applicable. *Id.*

On April 26, 2022, the trial court held a hearing on Alison's motion for contempt. Both parties testified at the hearing.

Adam testified that although he made monthly alimony payments after the parties divorced, he never made any direct payments toward the parties' joint debt. Adam stated that after the divorce, the rental house sold for $16,000 and that he turned those proceeds over to Alison, and after giving her credit for about $5000 she had expended toward the upkeep of the house, he expected that she would allocate the remaining $11,000 toward the marital debt.

Adam gave the following testimony regarding the circumstances surrounding the entry of the parties' divorce decree. Adam stated that in the PSA signed by the parties that was twice rejected by the trial court, the parties agreed that neither party would pay alimony. Adam stated that when Alison later retained an attorney to draft the divorce decree, she told him that "nothing was changing" and that "[he] trusted her and [he] believed her." Adam

4

stated that when he went to Alison's lawyer's office to sign the divorce decree, the secretary handed him a single piece of paper, which was only the signature page, and he signed it. Adam testified that at that time, he did not see the divorce decree itself but only the signature page. Adam testified that when he signed the signature page, he did not know the divorce decree required him to pay monthly alimony.

Adam stated that he did not know about the alimony provision in the divorce decree until he was talking with Alison ten days after the decree was entered. According to Adam, Alison told him that she added that provision to "protect herself." Adam stated that Alison told him that his alimony payments were going toward their joint debt and also to help Alison pay the mortgage on the Van Buren property awarded to her in the divorce. Adam stated that because the parties' joint debt had been paid off, he thought he was no longer required to pay alimony. However, Adam also stated multiple times in his testimony that he thought he was no longer required to pay alimony because Alison had remarried. He stated, "She remarried, I thought it was over." As for why he made alimony payments for nineteen months without taking Alison back to court, Adam stated, "[W]e had an agreement that she would pay that stuff out of the alimony" and that "if I would have known that I would have to pay for five years . . . I would have took it back right then."

Alison testified that since the parties' divorce, she had consistently made the $1011 monthly payment on the parties' joint debt and also applied some of the proceeds from the sale of her house to the joint debt. Alison stated that Adam quit paying alimony in April 2021 and that he should be ordered to continue to pay alimony for the remainder of the five

5

years as agreed by the parties and ordered in the divorce decree. Alison denied that the purpose of the alimony was to help pay the parties' joint debts. Alison explained:

> The purpose of the alimony—it was a conversation that Adam and I had in my kitchen actually when he agreed to help me pay, because I told him I could not afford the [Van Buren marital] home by myself, and it was already hard to pay all the bills and everything that I was already paying. So, it was a verbal conversation that he and I had in my kitchen after the first two previous decrees were filed when he and I had that conversation. . . . So, when he asked me was anything changed, I said nothing that we hadn't already agreed upon. So, he agreed to help pay.

The evidence at the hearing included text messages exchanged between the parties after the divorce pertaining to the alimony. In one of these texts, Adam stated:

> U came up w/ $1000 a month on ur own. I told you I'd help on the house 2/3 of the payment is not helping—It's above that. Start paying $500 on the loan if u want. But how u can think that $1000 a month is your money and not part of the loan is ridiculous.

In another text, Adam stated, "U said that u would make it where both of us wouldn't be financially hurt. That's why on the decree that WE signed stated there would be NO alimony." In a text sent from Alison to Adam, she stated, "The only thing that was added in [the divorce decree from the PSA] was the alimony because you gave me a verbal agreement to help pay my mortgage and I was protect[ing] myself and put it in writing."

> At the conclusion of the hearing, the trial court announced from the bench:

> [T]his being the court of equity, I do not believe he ever agreed to alimony and he certainly didn't agree to alimony for five years. That was added by her to protect her for these payments.

>     So, when [the parties'] Sun Trust loan was paid off, the alimony ended in March of 2021. That's how I'm going to rule on the alimony. The alimony ended that. But he gets credit for that $19,500 paid. And so what I was coming up with, if you take the 29,945, and you take the—at the time of the divorce the Arkansas credit

card debt or I can't remember what—the Arkansas joint credit card $9,895.28. That totals $39,840.28. Divide that by two. Each party is responsible for those two debts, joint debts of $19,920.14. He paid 19,500 in alimony, which I'm showing a difference of $420.14 he owes her. And that's my math right now unless you guys convince me otherwise.

There's no way that if this case was heard by a judge, which it was heard by me, but it was uncontested, but if it was—the facts were presented, there's no way child support would have been that much and alimony on top of that of $2,000 when he's only bringing in $3,500 a month.

And then he's supposed to pay other bills on top of—pay these loans and mortgages on top of that. That just—that would wipe him out. He couldn't exist. He'[d] be working to pay her.

Alison's counsel noted at the hearing that there had been no Rule 60 motion alleging fraud and stated, "I don't think that his alimony can be modified." Alison's counsel stated, "I think the court lost its jurisdiction to modify without an argument that there was fraud perpetrated on the court." The trial court stated, "But this is the court of equity, and I think equity requires that this be justified to correct a wrong that he was unaware of." Adam's counsel then stated that "the court of equity has a lot of latitude as to how to handle things" and that "if that's what the court feels that . . . you're able to do, then that's obviously what my client wants because that's what he thought was going to happen."

The trial court made the following concluding remarks from the bench:

I got stacks of text messages in exhibits that that's what his thought was.

And his testimony that's what his thought was, and then her testimony that confirms what his thoughts were and she added that without his knowledge.

Whether he read that document or not, I think he came in there signing the same paperwork, didn't read it, and she added that and didn't tell him.

7

And I think she misled him, frauded him, or whatever you want to call it. But he was unaware of that alimony being in there, because I don't think he would have agreed to 60 percent of his income paying her and then on top of that paying the remaining of his income to pay off these debts, leaving him nothing to live on.

So being the Court of Equity, I am ending the alimony as of March '21. And I'm finding that . . . he gets credit [for his] alimony of $19,500 paid toward the [parties' joint debt].

On April 29, 2022, the trial court entered an order making these findings:

That [Adam] is not held in contempt of Court, and the Court finds that [Adam]'s alimony obligation shall cease as of March 2021. Further, each party owed $19,920.14 towards their joint debts. [Adam] is given credit of $19,500; therefore, [Adam] owes [Alison] $420.14, and said amount shall be paid by [Adam] to [Alison] within sixty (60) days from today's date. After said payment, [Adam] owes nothing further on the joint debts or to [Alison].

Alison now appeals.

## II. *Analysis*

Alison argues that the trial court erred in terminating Adam's alimony obligation and in converting his alimony payments to payments on the parties' joint debts, and the manner in which the trial court altered and amended the divorce decree requires reversal. Alison asserts that the divorce decree unambiguously and in plain terms required Adam to pay $1000 in monthly alimony for five years. Although the trial court's written order provides no explanation for the trial court's ruling, from the bench, the trial court found that Adam never agreed to pay alimony and that Alison placed the alimony provision in the divorce decree to cover the parties' joint debt obligation. The trial court stated from the bench that it thought that "she misled him, frauded him, or whatever you want to call it" and that "he was unaware of that alimony being in there." Alison argues that the trial court erred in

8

modifying the terms of the divorce decree in this manner because Adam never filed any pleading alleging fraud or requesting such relief, and Alison was not on notice that this would be an issue or would even be contemplated by the trial court at the contempt hearing. Alison correctly asserts that, in Adam's response to her motion for contempt, the only specific allegation he made was that his alimony obligation ended because Alison had remarried–a contention that Adam no longer makes on appeal. It was not until the hearing that Adam claimed, for the first time in his testimony, that he was not aware of the alimony provision in the divorce decree. We agree with Alison's argument.

The trial court modified the divorce decree more than two years after the decree was entered. In order to vacate or modify a judgment or order more than ninety days after it has been entered, the trial court must determine that at least one of the enumerated list of circumstances in Ark. R. Civ. P. 60(c) exists. *Joplin v. Joplin*, 88 Ark. App. 190, 196 S.W.3d 496 (2004). Rule 60(c)(4) allows a trial court to vacate or modify a judgment in the case of misrepresentation of fraud by an adverse party. There are five elements of fraud, and the party seeking to set aside a judgment for fraud has the burden of proving fraud by clear, cogent, and convincing evidence. *Joplin*, *supra*.

Here, Adam never filed a Rule 60 motion to modify the divorce decree nor did he ever reference Rule 60 in any of the proceedings below. Nor did the trial court ever mention Rule 60 either in its written order or in its comments from the bench. Instead, the trial court sua sponte modified the terms in the divorce decree, apparently based on its oral finding that "she misled him, frauded him, or whatever you want to call it." Even assuming,

arguendo, that this constitutes a finding of fraud under Rule 60(c)(4), we conclude that the trial court erroneously modified the divorce decree because fraud had not been pled, and Alison was not on notice to prepare a defense or that such modification was even at issue.

The supreme court reached a similar result in *Rogers v. Lamb*, 347 Ark. 102, 60 S.W.3d 456 (2001). In *Rogers*, Lamb filed a petition for ejectment against Rogers, who filed an answer and a counterclaim against Lamb. The trial court held a preliminary hearing and received briefs from the parties, and it then, sua sponte, entered an order resolving the merits of the case in Lamb's favor. On appeal, Rogers argued that the trial court erred in rendering its decision in the absence of an appropriate motion filed by either party. The supreme court agreed and reversed the order, holding that the trial court's sua sponte ruling deprived the parties of an opportunity to present evidence or witness testimony in support of their positions. *See also Lipsey v. Giles*, 2014 Ark. 309, 439 S.W.3d 13 (holding that the trial court erred in dismissing appellants' complaint on a ground not argued by the appellee because this deprived appellants of notice of the trial court's intentions and an opportunity to present proof on the issue); *Country Pride Foods Ltd. v. Medina & Medina*, 279 Ark. 75, 648 S.W.2d 485 (1983) (holding that it was erroneous for the trial court to dismiss the complaint sua sponte due to inconvenient forum, without hearing evidence, when there had been no motion to dismiss filed by either party). Similarly, because no Rule 60 motion was filed in the present case and Alison was not on notice that fraud would be an issue at the contempt hearing, the trial court erred in modifying the divorce decree based on its apparent finding of fraud.

In Adam's brief, he argues that the modification should be affirmed, and he cites *Dickson v. Fletcher*, 361 Ark. 244, 206 S.W.3d 229 (2005), where the supreme court affirmed the modification of the parties' divorce decree under Rule 60(c)(4) because the husband had committed fraud. However, the *Dickson* case further illustrates why the present case should be reversed. In *Dickson*, the wife *filed a motion* alleging that the husband committed fraud in presenting false financial information to the trial court upon divorce, and the wife asked for an equal division of the husband's previously undisclosed stock. The trial court granted the relief sought by the wife and entered an order modifying the divorce decree under Rule 60(c)(4). *Dickson* is distinguishable from the present case because, in *Dixon*, there was a motion to modify filed with the specific allegations therefor, which clearly put the appellant on proper notice with an opportunity to defend the allegations.

Finally, we observe that in his brief, Adam further asserts that in his written amended response to Alison's motion for contempt—in addition to claiming that his alimony terminated upon Alison's remarriage and asking that her contempt motion be denied—Adam also requested "any and all proper relief to which [he] may be entitled." To the extent Adam is arguing that this put Alison on notice of a specific allegation of fraud, a request to modify the divorce decree, and the necessity to defend against the same at the contempt hearing, we disagree.

### III. *Conclusion*

We hold that in the absence of a Rule 60(c) motion to modify the parties' divorce decree or proper notice to appellant that such modification was at issue, the trial court erred

11

in sua sponte modifying the decree more than ninety days after the decree had been entered. Therefore, we reverse the provisions in the trial court's April 29, 2022 order that terminated Adam's alimony obligation and credited the alimony previously paid against the parties' joint debt.

Reversed.

KLAPPENBACH and BROWN, JJ., agree.

*Brian G. Brooks, Attorney at Law, PLLC*, by: *Brian G. Brooks*, for appellant.

*Jennifer Lloyd*, for appellee.