Cite as 2025 Ark. App. 226

# ARKANSAS COURT OF APPEALS
DIVISION I
No. CV-24-72

| | |
|---|---|
| KAMIL BAY<br><br>APPELLANT<br><br>V.<br><br>CAHYANDINI FAJRIATI<br>APPELLEE | Opinion Delivered April 16, 2025<br><br>APPEAL FROM THE BENTON COUNTY CIRCUIT COURT<br>[NO. 04DR-21-1262]<br><br>HONORABLE DOUG SCHRANTZ, JUDGE<br><br>AFFIRMED |

**ROBERT J. GLADWIN, Judge**

Kamil Bay appeals the June 9, 2023 order of the Benton County Circuit Court changing custody of the parties' minor child (M.C.) to appellee, Cahyandini Fajriati, as well as the July 23 deemed denial of Bay's motion for a new trial. Bay argues that (1) the circuit court lacked jurisdiction to re-decide custody; (2) there was no material change of circumstances; and (3) changing custody was not in M.C.'s best interest.

I. *Facts and Procedural History*

Bay and Fajriati were married on April 29, 2020, after meeting through the online dating site, AsianDating.com. One child, M.C., was born of the marriage on February 11, 2021.

On July 1, the parties separated. On August 4, Bay petitioned for a divorce, specifically requesting primary custody of M.C.

On September 10, Fajriati signed a document in which she "waive[d] the time to answer, plead or demur," waived discovery, and acknowledged that the cause may be heard at any time. On September 28, the case was submitted on affidavits, and the initial decree of divorce was entered the same day. Bay was granted full custody of M.C. subject to Fajriati's visitation. It is undisputed that Fajriati's signature appears on the decree, and the decree specifically stated that the circuit court had jurisdiction over the parties and subject matter.

Eighty-six days later, on December 23, Fajriati moved to set aside the divorce decree on the grounds of fraud, misrepresentation, and duress. Fajriati asserted that the circuit court had jurisdiction of the parties and the subject matter set forth in her motion. She claimed to have been kept in a room in the marital home, under camera supervision, to make sure she did not leave. She claimed she had not been provided a bed, "was only given food (oatmeal)" at Bay's discretion, and had no access to a telephone or transportation. She claimed to have been subjected to "abuse and torture" by Bay's mother in Bay's presence. She alleged that Bay's mother beat her with a tennis racket and, later, a ping-pong paddle in Bay's presence because he had taken her to his brother's house instead of the lawyer's office.

In his response, Bay acknowledged that the circuit court had jurisdiction. Despite Bay's contention on appeal that he did not agree to the circuit court's jurisdiction, a hearing on Fajriati's motion was held on April 6, 2022, but was recessed early and continued due to the interpreter's schedule. In an order that followed on May 11, the circuit court set forth that it had jurisdiction over the parties and subject matter; that the divorce decree would not be set aside and would remain in full force and effect; and that the issues of child custody,

visitation, and child support would be determined by the circuit court as an initial adjudication. The order was approved by counsel for both parties, but neither party signed the order. It is undisputed that the circuit court did issue that order before the ninetieth day after the decree was filed.

On July 5, the circuit court entered an agreed temporary order that modified custody of M.C. to joint custody and appointed an attorney ad litem. Again, the agreed order stated that the circuit court had jurisdiction over the parties and subject matter and was signed by counsel for all parties.

On May 8, 2023, the final hearing related to custody, visitation, and support issues commenced, which was conducted over three days (May 8–9 and 26). Notably, on May 10, Fajriati filed a counterpetition for custody and child support.

At the conclusion of the three-day hearing, the circuit court cited numerous factors to support an award of custody of M.C. to Fajriati, including, but not limited to, the inability of Bay to co-parent, the physical and mental abuse brought upon Fajriati by Bay and his mother, and a finding that Bay treated Fajriati as little more than "breeding stock."

Bay then filed a motion for a new trial, arguing that the circuit court lacked jurisdiction to issue its order on June 9, 2023, and that the order was clearly contrary to the preponderance of the evidence pursuant to Arkansas Rule of Civil Procedure 59(a)(6) (2023). Bay requested that the circuit court vacate the June 9 order and reinstate the court's September 28, 2021 divorce decree in its place. The motion was deemed denied, and on July 4, Bay filed his notice of appeal of the circuit court's order.

## II. *Standard of Review*

We perform a de novo review of child-custody matters, but we will not reverse the circuit court's findings unless they are clearly erroneous. *Hamerlinck v. Hamerlinck*, 2022 Ark. App. 89, at 12, 641 S.W.3d 659, 665. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Id.* at 12–13, 641 S.W.3d at 665. While a circuit court retains jurisdiction to modify an initial child-custody award, the standard for modification is more stringent than it is for the initial determination. *Reynolds v. Reynolds*, 2024 Ark. App. 229, at 6, 687 S.W.3d 584, 589. A party seeking to modify custody must prove that a material change of circumstances has occurred since the last order of custody or that material facts were unknown to the court when the decree was entered. *Id.* If that threshold requirement is met, the court must then determine who should have custody with the sole consideration being the best interest of the child. *Id.* at 7, 687 S.W.3d at 589. On issues of child custody, the reviewing court gives "special deference to the superior position of the circuit court to evaluate the witnesses, their testimony, and the child's best interest." *Cunningham v. Cunningham*, 2019 Ark. App. 416, at 4, 588 S.W.3d 38, 40. The evidence will not be reweighed and evaluated differently than the circuit court. *Hamerlinck*, 2022 Ark. App. 89, at 15, 641 S.W.3d at 667.

III. *Discussion*

A. Did the Circuit Court Have Jurisdiction to Change Custody?

Bay argues that the circuit court lacked the power to amend the original divorce decree after ninety days, and in support, he cites *Dorey v. Dorey*, 2024 Ark. App. 199, at 9, 686 S.W.3d 618, 623 (reversing the modification of a divorce decree "more than two years after the decree was entered" because there was no Rule 60(c) exception). The filing of the original divorce decree set a ninety-day deadline during which it could be reopened for general miscarriages of justice. *See* Ark. R. Civ. P 60 (2024). He submits that after that deadline, the circuit court lost the power to set aside or modify the decree absent an enumerated exception, even if a motion was timely filed before the expiration of that period. *See Dye v. Diamante*, 2017 Ark. 37, 509 S.W.3d 643 (citing Ark. R. Civ. P. 60(c)).

The circuit court entered the original decree on September 28, 2021. The decree vested Bay with sole custody of M.C. and was signed by Fajriati. The ninety-day window closed on December 27, 2021. A year and a half after the deadline, the circuit court entered a "final order" that purported to re-decide custody as an initial adjudication. Even though Fajriati moved to set aside the decree before the deadline, Bay, citing *Dye*, *supra*, argues that the circuit court lost the power to grant the motion after December 27, 2021. He contends that because the circuit court exercised jurisdiction where there was none, the proper relief is to reverse and dismiss the June 9, 2023 order.

We disagree. Circuit courts in Arkansas retain exclusive, continuing jurisdiction over issues of child custody, visitation, and support. *Kyle v. Off. of Child Support Enf't*, 2019 Ark.

App. 491, at 7, 588 S.W.3d 754, 758; Ark. Code Ann. § 9-19-202 (Repl. 2020). This jurisdiction continues regardless of the status of the parties' divorce. *See Rogers v. Rogers*, 80 Ark. App. 430, 439, 97 S.W.3d 429, 435 (2003) (holding that circuit courts have exclusive jurisdiction over issues of child support regardless of whether they have jurisdiction to grant a divorce and stating that this principle "embodies sound public policy"). Regardless of whether the circuit court viewed the June 9, 2023 award of custody to Fajriati as an initial custody determination or a modification of custody, we hold that the circuit court did not err when it found that it had jurisdiction over the parties and the subject matter involved.

B. Was There a Material Change of Circumstances?

In addition to his challenge to the circuit court's jurisdiction, Bay argues that it was clearly erroneous for the circuit court to change custody because there was neither evidence nor a finding of a material change in circumstances. The purpose of this requirement is to promote stability and continuity in M.C.'s life and to discourage repeated litigation of the same issues. *See Reynolds*, 2024 Ark. App. 229, at 7, 687 S.W.3d at 589. Over the course of M.C.'s short life, primary custody changed from Bay (nine months) to joint (eleven months) then to Fajriati (since June 2023). Bay argues that by disregarding this elemental change-in-circumstances requirement, the circuit court introduced chaos into M.C.'s most formative years.

Bay avers that the circuit court made no mention of a material change in circumstances because his attorney stipulated that the custody determination could be decided anew. Bay, citing *Losurdo v. Losurdo*, 2023 Ark. App. 584, 680 S.W.3d 487, maintains

that this stipulation cannot bind him because there is no indication it was made with authority. Because his signature does not appear on the May 11 and July 5, 2022 agreed orders, and there is nothing in the record indicating that Bay specifically agreed to its terms, he argues that *Losurdo* is controlling and requires reversal.

Bay argues that it was clearly erroneous for the circuit court to change custody without finding that a material change in circumstances had occurred since the last order of custody. *See Bonds v. Bonds*, 2021 Ark. App. 359, at 6, 634 S.W.3d 572, 577–78. Bay maintains that the record is silent regarding any harm to M.C. during the time in Bay's care. He submits that, to the contrary, Fajriati disclaimed concerns about Bay's role as father.

Bay urges that the circuit court had an independent duty to ensure that there was a countervailing benefit to offset the disruption that would result from a change of M.C.'s home life. He argues that because the circuit court neglected its duty to protect the stability in M.C.'s life, we should reverse the decision to change custody.

We disagree and hold that the material-change-of-circumstances standard was met. The circuit court heard significant evidence of Bay's inability to co-parent alongside Fajriati since the July 5, 2022 agreed order was entered, including how he created an extremely hostile environment toward Fajriati and how M.C. was at great risk of continued negative exposure should joint custody continue. And although physical harm of a child is not the only consideration supporting a finding that a material change in circumstances has occurred, Bay notes that "to find a material change in circumstances occurs, there must be some negative impact on the child." In addition to the above, the record before us includes

testimony from both Fajriati and Angelyn McMurray with We Are Free, an organization that provides services to human-trafficking victims, that after a Christmas visit with Bay, M.C. returned to Fajriati with bruising on the face. Accordingly, there was some evidence of physical harm presented to the circuit court that could be relied on to establish that there had been a material change in circumstances.

Moreover, the circuit court may also find a material change in circumstances on the basis of the "[f]ailure of communication, increasing parental alienation by a custodial parent, and inability to cooperate." *Snider v. Snider*, 2024 Ark. App. 317, at 7 (citing *Self v. Dittmer*, 2021 Ark. App. 85, at 9, 619 S.W.3d 43, 48). The record includes evidence of Bay's inability to communicate with Fajriati and his manipulation of her due to language barriers. Multiple witnesses testified concerning Bay's inability to treat Fajriati as an equal. The record contains many communications over a period of time via email and the court-approved application AppClose showcasing Bay's abrupt and bullying behavior towards Fajriati. Contrary to Bay's assertions, rather than disclaiming any concerns regarding Bay's role as a father, Fajriati testified to the abuse she suffered at Bay's hands and the subsequent undercutting of her role as a parent by both Bay and his mother since the entry of the July 5, 2022 order. Accordingly, we hold that there was sufficient evidence presented for the circuit court to determine there was a material change in circumstances to support its ultimate change of custody.

## C. Best-Interest Analysis

Finally, Bay argues that it was clearly erroneous for the circuit court to change custody because it was in M.C.'s best interest to stay with him. The circuit court's sole stated basis for placing M.C. with Fajriati was that Bay treated Fajriati as "not much more than breeding stock"—yet Bay notes that the parties have only one child. Bay contends that this decision is clearly erroneous because it is rooted in the circuit court's desire to punish him. *See Reynolds*, 2024 Ark. App. 229, at 8, 687 S.W.3d at 590 (holding that custody awards are not made or changed to punish, reward, or gratify the desires of either parent). He maintains that the clear preponderance of the evidence shows that only he is competent to care for M.C.

Bay submits that the operative question does not concern the parties' relationship with each other but rather what is in the best interest of the child. *E.g., Neal v. Neal*, 2016 Ark. App. 223, 491 S.W.3d 467. This court has analyzed this question from the viewpoint of parental stability. *See Roper v. O'Neal*, 2020 Ark. App. 431, at 4 (holding that the minor child's best interest was not placement with the mother whose life was marked by "overall instability," was reliant on the charity of third parties, had no permanent residence, and had no stable work environment).

Bay notes that he is gainfully employed, having worked at Walmart headquarters for ten years in analytics, and that he has a master's degree. In contrast, Fajriati is unemployed and not lawfully permitted to work or obtain a driver's license because she is an immigrant with an expired work-authorization status.

Bay also argues that he alone has stable housing and that Fajriati's housing is "fluid" and completely reliant on a third party—specifically, We Are Free, a nongovernmental organization that provides long-term care to survivors of human trafficking. Bay points out that the organization ordinarily provides services for up to twenty-four months, a period of time that ended for Fajriati in December 2023. However, it has been providing Fajriati with housing, food, shelter, medicine, counseling, and payment of legal expenses, which includes immigration assistance.

Bay argues that his ability to care for M.C.'s health is superior, pointing out that M.C. suffered from dehydration while under Fajriati's care. He submits that Fajriati also did not observe COVID-19 safety measures around M.C., which resulted in M.C. contracting the virus and requiring Bay take M.C. to the urgent-care clinic.

Bay references educational opportunity as another factor considered in the best-interest equation. *See Cooper v. Kalkwarf*, 2017 Ark. 331, 532 S.W.3d 58; *see also* Ark. Sup. Ct. Admin. Order No. 15(b)(3). Under Bay's care, M.C. had access to a Montessori education that was interrupted when M.C. was with Fajriati. He notes that the school's director testified that it would have benefited M.C. to be in attendance every week instead of every other week.

Bay also notes the relative availability of extended family as a recognized factor in the best-interests analysis is. *See Black v. Black*, 2015 Ark. App. 153, 456 S.W.3d 773. Under his care, M.C. has access to a grandmother who is trained as a pediatrician and two uncles, while all of Fajriati's family is in Indonesia.

Bay notes that it is also relevant to determine who serves as primary caregiver for the child. *See Thurmon v. Thurmon*, 2016 Ark. App. 497, 504 S.W.3d 675. He maintains that soon after the divorce, Fajriati intended to leave M.C. with him while she returned to Indonesia. Bay reminds us that the initial decree vested him with primary custody and that he allowed Fajriati to stay in his home while her COVID-19 vaccine took effect so she could travel back to Indonesia.

Finally, Bay notes another recognized factor is an individual's purposeful injury to the child. *See id.* He claims that testimony showed that Fajriati had hit and yelled at M.C., dropped M.C., and ignored M.C.'s cries. And contrary to his concerns about Fajriati's parenting, Fajriati specifically disclaimed having any concerns about Bay's parenting.

Bay, citing *Anderson*, *supra*, and *Reynolds*, *supra*, concludes that the circuit court clearly erred when it disrupted "a suitable and beneficial custody arrangement" and issued a custody determination on a naked desire to punish Bay. He urges that the proper relief is for this court to reverse the June 2023 order and reinstate the original custody determination.

We disagree. Our de novo review of the record supports the circuit court's determination that the best interest of M.C. was served by vesting full custody with Fajriati after analyzing, among other things, the abuse suffered by her. This court has considered the treatment—or rather, the maltreatment—of spouses in determining and weighing the best interest of the child. *See, e.g.*, *Corter v. Corter*, 2023 Ark. App. 266. In *Corter*, we upheld the circuit court's decision where the underlying record indicated that the husband physically abused the wife numerous times, including well-documented incidents of physical assault

11

and verbal attacks on her throughout their marriage. *Id.* Like the facts in *Corter*, evidence was presented that Bay physically abused Fajriati and treated her as if she was "not much more than breeding stock." We have held that physical abuse is evidence that may be utilized in establishing the best interest of a child and that it is "the legislative directive that it is *not in a child's best interest to be in the custody of an abusive parent.*" *Id.* at 4 (citing Ark. Code Ann. § 9-13-101(c) (Supp. 2021) (emphasis added)).

In determining M.C.'s best interest, the circuit court heard three days of testimony from various witnesses, including the parties; Bay's mother, Rahima Bay; Angelyn McMurray, with We Are Free; and the attorney ad litem, Buffy Merryman. Fajriati testified as to the mental, verbal, and physical abuse inflicted by Bay and his mother, and there is no way this court is left with a definite and firm conviction that the circuit court erred in its award of custody to Fajriati. The evidence included photos of bowls of food that were left out for Fajriati to eat with crude language written on them. Fajriati testified that she was not allowed to be downstairs in what was supposed to be her home. She testified that Bay would control, scare, and intimidate her to such an extent that it was impossible to establish an effective co-parenting relationship. Fajriati further testified that her lack of employment is in no small part due to her not having the required documentation because Bay kept it from her.

Regarding Bay's argument that Fajriati is unable to provide a stable and loving home to M.C. and is entirely dependent on a third party, Angelyn McMurry from We Are Free specifically testified that the organization had a credible belief that Fajriati had been a victim

of labor trafficking, that Fajriati lacked control over her physical location, and that she had limited access to M.C. McMurray confirmed that Fajriati would have care, housing, and coverage of legal fees, especially in handling her immigration issues, as long as necessary. McMurry stated that We Are Free provides all of a person's physical needs and promotes independence and self-sustainability of individuals who are in a position to need their services. She specifically testified that Fajriati can stay with the organization for as long as she requires and that there is no deadline regarding her stay.

McMurry responded to concerns raised by Bay regarding M.C.'s medical care, testifying that when Fajriati first came to We Are Free, she had a constant need to monitor and correct M.C.'s behavior. McMurry testified that Fajriati would over parent M.C. out of fear of not being able to see her child and out of fear of Bay's overreactions.

Testimony was also elicited regarding Bay's continued failure to provide timely child-support payments.

In its order vesting custody of M.C. with Fajriati, the circuit court found that it considered the following in its decision: "[Bay] is not capable of making long term changes regarding his relationship and communications with the [Fajriati]," and "[Bay] is engaged in intimidation of [Fajriati]." The circuit court found that Bay excluded Fajriati from involvement in M.C.'s medical care, limited the care Fajriati received during her pregnancy, and prohibited pain medication at the time of M.C.'s birth. The circuit court stated that "[t]he relationship of the parties also relates to the ability of the parents to parent" and considered this evidence in determining the best interest of M.C.

The circuit court noted that Fajriati had a "palpable reaction and could barely look at [Rahima Bay] testifying on the stand." The circuit court's order also found that Bay was taking M.C. for unnecessary medical care in "an effort to blame [Fajriati] for insufficient care of [M.C.]" and that it would "not tolerate unnecessary medical care regarding [M.C.]." The circuit court was in a greater position to evaluate Bay's and his mother's inconsistent testimony. There was clear evidence presented to the circuit court detailing how Bay's mother falsified information to doctors, including holding herself out to be a physician in Little Rock, Arkansas. Despite Ms. Bay's testimony that she was not involved in the decisions being made by Fajriati and Bay regarding M.C., the record shows that she attended pediatrician visits with M.C., without Fajriati's permission and in her place, and that she was on the phone with Bay during M.C.'s delivery, advocating for the withholding of pain medication during childbirth.

Finally, the circuit court placed great emphasis on the testimony of the court-appointed attorney ad litem, Buffy Merryman, who testified that it was her opinion that it was in M.C.'s best interest for Fajriati to have primary custody. Merryman communicated clearly to the circuit court that Bay was "slick with his testimony in court" and that "this type of behavior is not exemplary of a father and a poor example for [M.C.]." Her testimony provided further evidence to the circuit court regarding the inequity in the parties' relationship and that co-parenting would be impossible:

> Mr. Bay brought over a young woman from Indonesia to the U.S. and exploited her youth, her lack of family and friends, her lack of knowledge and understanding, then

divorced her and took their baby, and today would like to hold these very weaknesses against her as a parent when [Bay] has created this problem.

She testified that Bay will "discourage the bond between mother and son and the relationship and create obstacles at every step has been demonstrated through this trial."

The record indicates that the circuit court found credible the testimony and evidence of the abuse suffered by Fajriati from Bay and his family. The circuit court found that the best interest of M.C. in a stable environment is for her to be placed with Fajriati, as supported by multiple witnesses. The circuit court considered an overwhelming amount of testimony and evidence that supports its adjudication and determination of the best-interest issue. Bay's argument is essentially that we should weigh the evidence differently than the circuit court did. It is well settled that we do not reweigh the evidence on appeal. *Cline v. Simpson*, 2024 Ark. App. 611, at 11, 703 S.W.3d 497, 504. After our review of the court's findings, the record as a whole, and the applicable case law, we conclude that the circuit court's decision to modify the custody arrangement in this case was not clearly erroneous. We therefore affirm.

Affirmed.

HARRISON and HIXSON, JJ., agree.

*Matt Kezhaya* and *Sonia Kezhaya*, for appellant.

*Friday, Eldredge & Clark, LLP*, by: *William A. Waddell, Jr.*, *Melody Pruitt Guffey*, and *Johanna B. Wade*, for appellee.